**KELLER ROHRBACK L.L.P.**
Lynn L. Sarko
Derek W. Loeser
Karin B. Swope
Tyler L. Farmer
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
Steven Singer (SS-5212)
Jonathan Harris (JH-3047)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

*Attorneys for Plaintiffs and the Class*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------

| | |
|---|---|
| MERRIMACK MUTUAL FIRE INSURANCE CO. and ALAN KOBER, TRUSTEE OF THE ANDOVER COMPANIES EMPLOYEES SAVINGS AND PROFIT SHARING PLAN (the "Plan") on behalf of the Plan and all other plans similarly situated )<br><br>Plaintiffs,<br><br>v.<br><br>STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL ADVISORS, INC. and JOHN DOES 1-20,<br><br>Defendants. | 07 Civ. 9687<br><br>FIRST AMENDED CLASS ACTION COMPLAINT |

-----------------------------------------------------------------------

Plaintiffs Merrimack Mutual Fire Insurance Company and Alan Kober, Trustee of The Andover Companies Employees Savings and Profit Sharing Plan (the "Plan"), on behalf of the Plan and all other plans similarly situated, by and through their undersigned attorneys Bernstein Litowitz Berger & Grossmann LLP and Keller Rohrback L.L.P., allege the following based upon knowledge with respect to their own acts, and on information and belief, based upon facts obtained through investigation by its counsel.

## I.    PRELIMINARY STATEMENT

1.    This complaint arises from Defendants State Street Bank and Trust Company's ("State Street Bank") and State Street Global Advisors, Inc.'s ("SSGA") (collectively "State Street") reckless disregard of the best interests of investors in conservative bond funds managed by State Street in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"). State Street breached its fiduciary duties under ERISA to thousands of ERISA plans and plan participants and beneficiaries by causing State Street's purportedly conservative bond funds, which are held in collective trusts by State Street and offered to retirement plans throughout the country ("Bond Funds") to invest in high-risk and highly leveraged financial instruments tied to, among other things, mortgage-backed securities. State Street represented those Bond Funds, described in detail below, to be conservative investments designed to closely track, and slightly outperform, designated bond market indices. In reality, State Street converted the purportedly-stable conservative investments into a high-stakes gamble in breach of State Street's fiduciary duties under ERISA

2.    Contrary to their representations about the Bond Funds' low-risk profile, State Street invested the assets of these Bond Funds in high-risk derivative instruments including volatile asset-backed securities and subprime mortgage-backed securities.

1

Further compounding the risk to Plaintiffs and the Class, State Street highly leveraged the Bond Funds' investments in such instruments by borrowing money to purchase those instruments – in some case by ratios as high as six to one – thereby exponentially increasing the risk to which ERISA plans and plan participants and beneficiaries in these purportedly "stable" and "predictable" funds were exposed. In addition to these highly leveraged investments in subprime mortgage-backed securities, State Street also improperly invested in exotic financial instruments such as Treasury futures, options on futures, interest rate swaps, and interest rate "swaptions."

3.     An analyst at Lipper, Inc. summarized State Street's mismanagement of these funds: "When you're investing in an investment-grade debt fund, you are expecting some level of preservation of capital. Some funds have held certain subprime issues, and for their intrepid adventures, investors have suffered terribly."

4.     The recent collapse of the subprime mortgage industry exposed the aggressive gamble State Street took with the retirement assets invested by ERISA plans and plan participants and beneficiaries in the Bond Funds. The value of the mortgage-backed securities in which State Street had invested plummeted, with some of the Bond Funds performing nearly 30 percent below the benchmark indices they purported to track. That poor performance resulted from the nearly 70 percent collapse in value of the mortgage-backed securities held by the fund. Moreover, the subprime collapse eviscerated demand for such securities, forcing State Street to sell those mortgage-backed securities into an illiquid market. By the time ERISA plans and plan participants and beneficiaries became aware of the dire consequences of State Street's imprudent actions,

2

and demanded the withdrawal of their funds, there was no market for the securities, further compounding the losses to investors in the Bond Funds.

5.    An exchange during State Street's October 16, 2007 teleconference suggests that State Street's active mismanagement of fixed income funds exposed to subprime securities has resulted in staggering losses for investors:

> Mike Mayo, Deutsche Bank Analyst:
>
> And then lastly, the fixed income funds that are actively managed dealing with subprime, it went from $8 billion down to $3 billion in the last three months. So, does that mean your potential legal exposure is $5 billion, and if it isn't can you size potential risk?
>
> Ron Logue, State Street Chairman and CEO:
>
> It's hard to size potential risk, Mike, people get in and out, there were withdrawals, transfers during that period of time. So it's a difficult thing to do.

6.    State Street's imprudent actions have caused the ERISA plans that offered the Bond Funds for which State Street served as the Investment Manager to suffer hundreds of millions of dollars of losses.

7.    State Street's conduct was a gross dereliction of its fiduciary duties under ERISA for which State Street is personally liable.  Accordingly, Plaintiffs allege that State Street, as the investment manager for the Bond Funds for ERISA retirement plans throughout the country, breached its duties of prudence, loyalty, and exclusive purpose under ERISA §404(a) by investing the assets of the Bond Funds recklessly and imprudently.

8.    This action is brought on behalf of Plaintiffs' ERISA plan, as well as all other similarly situated plans throughout the country that offered the Bond Funds as investment options for their participants.  All of these plans were subject to, and were

affected by, State Street's conduct in the same manner and with the same effect. Plaintiffs seek losses to these plans for which State Street is personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2). In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiffs seek other equitable relief from State Street, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, equitable tracing, and other monetary relief.

9.    ERISA §§ 409(a) and 502(a)(2) authorize ERISA plan participants and plan fiduciaries such as Plaintiffs to sue in a representative capacity for losses suffered by the plans as a result of breaches of fiduciary duty. Pursuant to that authority, Plaintiffs bring this action as a class action under Fed. R. Civ. P. 23 on behalf of plans that offered the Bond Funds and suffered losses due to State Street's gross dereliction of its fiduciary duties under ERISA during the Class Period.

10.    In addition, because the information and documents on which Plaintiffs' claims are based are, for the most part, solely in State Street's possession, certain of Plaintiffs' allegations are by necessity upon information and belief. At such time as Plaintiffs have had the opportunity to conduct discovery, Plaintiffs will, to the extent necessary and appropriate, amend this Complaint, or, if required, seek leave to amend, to add such other additional facts as are discovered that further support Plaintiffs' claims.

## II.    JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1). This claims asserted herein are brought as a class action under Rule 23 of the Federal Rules of Civil Procedure.

12.    Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

4

### III.     THE PARTIES

**A.     THE PLAINTIFFS:**

13.     Plaintiff Alan Kober is an Individual Trustee of The Andover Companies Employees' Savings and Profit Sharing Plan (the "Andover Companies Plan" or the "Plan") pursuant to § 10.03 of The Andover Companies Employees' Savings and Profit Sharing Plan and Trust Agreement, Amended and Restated Effective as of January 1, 1989 ("Plan Document"). In this capacity, Mr. Kober is a Plan fiduciary with authority to bring claims for breach of fiduciary duty on behalf of the Plan pursuant to ERISA §§ 409 and 502(a)(2).

14.     Plaintiff Merrimack Mutual Fire Insurance Company ("Merrimack Mutual") is designated Plan Administrator for the Andover Plan pursuant to § 10.02 of the Plan Document. The Andover Plan is an ERISA-qualified plan established for the benefit of employees of Merrimack Mutual and its sister companies, Cambridge Mutual, and Bay State, which, together with Merrimack Mutual, comprise the Andover Companies ("Andover Companies"). Andover Companies is a New England mutual insurance institution. It offers insurance programs and is managed from its headquarters in Andover, Massachusetts. During the Class Period, the Andover Companies Plan invested approximately $3 million in the SSGA Enhanced Intermediate Bond Fund ("Enhanced Intermediate Bond Fund") and the Andover Companies Plan suffered losses as a result. State Street served as the Trustee for Andover Companies Plan, and served as the Investment Manager for the Enhanced Intermediate Bond Fund, which was one of the investment options offered by the Plan.

**B.    THE DEFENDANTS:**

15.    State Street Bank is a registered financial holding company with its principal place of business in Boston, Massachusetts, and which maintains an office in New York, New York.

16.    SSGA purports to be the world's largest institutional asset manager. SSGA's principal office is located in Boston, Massachusetts.    SSGA acted as the Investment Manager for the Bond Funds as that term is defined by ERISA § 3(38), 29 U.S.C. § 1002(38).

17.    John Does 1-20.  Plaintiffs currently lack the names of the individual State Street employees responsible for discharging State Street's duties and responsibilities as the Investment Manager under ERISA for the Bond Funds at issue.  Once the names of these persons are identified, to the extent necessary and appropriate, Plaintiffs will amend the Complaint to add their true identities.

## IV.    CLASS ACTION ALLEGATIONS

18.    **Class Definition**.  Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plan and the following class of persons similarly situated (the "Class"):

> All qualified ERISA plans, and the participants and beneficiaries thereof, who were invested in the Enhanced Intermediate Bond Fund, the Intermediate Bond Fund for Employee Trusts, the Daily Bond Market Fund, the Core Intermediate Credit Bond Fund, the Daily Corporate / Government Credit Bond Fund, the SSGA Yield Plus Fund, the Total Bond Market fund, the SSGA Bond Market Fund, the Limited Duration Bond Fund or any other Bond Fund managed by State Street for qualified ERISA retirement plans that suffered losses as a result of the same conduct described herein (the "Bond Funds") between January 1, 2007 and October 5, 2007. Specifically excluded from the Class are the individual Defendants

6

herein, officers and/or directors of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which a Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party, other than qualified ERISA plans offered by State Street or any of its affiliates to its employees and which suffered losses as well due to investment in the Bond Funds.

19.    **Numerosity**. The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that hundreds of ERISA qualified plans throughout the country offered the Bond Funds during the Class Period, and sustained losses as a result, and that these plans collectively have thousands of participants and beneficiaries.

20.    **Commonality**.  The claims of Plaintiffs and the members of the Class have a common origin and share a common basis.  The claims of all Class members originate from the same misconduct, breaches of duties and violations of ERISA, perpetrated by the Defendants.  Proceeding as a nationwide class is particularly appropriate here because the Bond Funds are held in collective trusts managed by State Street, in which assets of every plan that offers the Bond Funds are pooled, and, therefore, State Street's imprudent actions affected all plans that invested in the Bond Funds in the same manner.

21.    Furthermore, common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  The many questions of law and fact common to the Class include:

a.    Whether Defendants breached their fiduciary duties under ERISA;

7

b.      Whether Defendants deviated from the true and proper purpose of the Bond Funds when they invested in highly risky, exotic, and speculative investments in the Bond Funds;

c.      Whether Defendants failed to provide complete and accurate information to plan sponsors, fiduciaries, and participants when they invested in highly risky, exotic, and speculative investments in the Bond Funds;

d.      Whether Defendants' acts proximately caused losses to the plans at issue, and if so, the appropriate relief to which Plaintiffs, on behalf of the Plan and the Class, are entitled;

22.    **Typicality**.  Plaintiffs' claims are typical of the claims of the members of the Class because:  (a) to the extent Plaintiffs seek relief on behalf of the Plan pursuant to ERISA § 502(a)(2), its claims on behalf of the Plan are not only typical to, but identical to a claim under this section brought by any Class member; and (2) to the extent Plaintiffs seek relief under ERISA § 502(a)(3) on behalf of themselves for equitable relief, that relief would affect all Class members equally.  If brought and prosecuted individually, each of the members of the Class would necessarily be required to prove the instant claims upon the same material and substantive facts, upon the same remedial theories and would be seeking the same relief.

23.    **Adequacy**.  Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.  The proposed representatives will undertake to vigorously protect the interests of the absent members of the Class.

8

24.    **Rule 23(b)(1)(A) & (B) Requirements**.  Class action status in this ERISA action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status also is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

25.    **Rule 23(b)(2) Requirements**.  Certification under 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

26.    **Rule 23(b)(3) Requirements**.  In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

### V.    THE ERISA PLANS AT ISSUE

27.    The Andover Companies Plan invested in the Enhanced Intermediate Bond Fund.  The Andover Companies Plan is a profit sharing plan for the employees of Merrimack Mutual.  The Plan was established in 1963 to provide retirement and other incidental benefits to Merrimack Mutual employees and was amended and restated in 2002 to comply with all applicable statutes, including the Employee Retirement Income

9

Security Act of 1974 (ERISA) and the Internal Revenue Code of 1986, and all applicable rulings and regulations thereunder.

28.     According to the June 30, 2006 Investment Policy Statement for the Plan, "[t]he primary goal …is to provide retirement benefits to Plan participants and their beneficiaries by offering opportunities for long-term asset accumulation."

29.     Pursuant to a Trust Agreement, originally effective April 1, 2001, and restated on September 1, 2002 ("Trust Agreement"), State Street contracted to act as trustee of a trust fund for the Plan's assets with express responsibility to create, hold, invest, and manage the funds for the benefit of the Plan.  Pursuant to ¶ 3.5 of the Trust Agreement, State Street was exclusively responsible for the management of assets held in any "Trustee Managed Account."

30.     State Street previously established various investment funds held in a collective trust created on February 21, 1991 ("State Street Retirement Plans Trust"). Pursuant to ¶ 3.4 of the Fourth Amended and Restated Declaration of Trust for the State Street Retirement Plans Trust, "the funds shall be under exclusive management and control of the Trustee in conformity with the provisions of this Declaration of Trust."

31.     Subsequent to the establishment of the State Street Retirement Trust, State Street formed the Enhanced Intermediate Bond Fund and offered it as an investment option to retirement plans, including the Andover Companies Plan.

32.     Under the terms of the Enhanced Intermediate Bond Fund, State Street was at all times relevant responsible for the management and control of the assets invested in the fund, and acted as the fund's Investment Manager, as that term is defined in Section 3(38) of ERISA.

33.     In addition to the Enhanced Intermediate Bond Fund, State Street operated and managed several other funds, the assets of which were held in collective trusts by State Street, including the Intermediate Bond Fund for Employee Trusts, the Daily Bond Market Fund, the Core Intermediate Credit Bond Fund, the Daily Corporate / Government Credit Bond Fund, the SSGA Yield Plus, the Total Bond Market Fund, SSGA Bond Market Fund, and the Limited Duration Bond Fund, all of which were described as low-risk investment vehicles, purportedly designed to track or slightly exceed the Lehman Brothers Aggregate Bond Index.   Upon information and belief, State Street served as the ERISA Investment Manager or functioned as the investment fiduciary for the Bond Funds for each ERISA plan throughout the country that offered one or more of the Bond Funds.

34.     Numerous ERISA plans offered the Bond Funds as a conservative investment option for participants' retirement savings.   ERISA plans and plan participants directed hundreds of millions of dollars of retirement savings into the Bond Funds.

35.     On information and belief, State Street pooled the assets of the respective Bond Funds and managed the collective fund pursuant to a common strategy.  As alleged herein, at some juncture in early 2007, State Street's management deviated from its stated strategy and directed the assets into leveraged positions on high-risk investments, including subprime mortgage-backed securities and other illiquid asset-backed securities, exposing all of the Bond Funds to enormous risk.

36.     Because all of the Bond Funds were held in collective trusts by State Street and centrally managed, State Street's imprudent conduct with respect to the Bond

11

Fund affected all ERISA plans that offered the Bond Funds in the same manner, that is, they all were exposed to the same unacceptable risk, and suffered losses because of the same imprudent management by State Street.

## VI.    DEFENDANTS' FIDUCIARY STATUS

37.    **Named Fiduciaries**.    Every plan must have one or more "named fiduciaries." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

38.    **De Facto Fiduciaries**.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

39.    **Investment Manager.**    Under ERISA, an investment manager is a fiduciary. ERISA defines investment manager as:

> (38) any fiduciary (other than a trustee or named fiduciary, as defined in section 1102 (a)(2) of this title)—
>
> (A) who has the power to manage, acquire, or dispose of any asset of a plan;

(B) who

(i) is registered as an investment adviser under the Investment Advisers Act of 1940 [15 U.S.C. 80b–1 et seq.];

(ii) is not registered as an investment adviser under such Act by reason of paragraph (1) of section 203A(a) of such Act [15 U.S.C. 80b–3a (a)], is registered as an investment adviser under the laws of the State (referred to in such paragraph (1)) in which it maintains its principal office and place of business, and, at the time the fiduciary last filed the registration form most recently filed by the fiduciary with such State in order to maintain the fiduciary's registration under the laws of such State, also filed a copy of such form with the Secretary;

(iii) is a bank, as defined in that Act; or

(iv) is an insurance company qualified to perform services described in subparagraph (A) under the laws of more than one State; and

(C) has acknowledged in writing that he is a fiduciary with respect to the plan.

Section 3(38), 29 U.S.C. § 1002(38).

40.    Here, State Street served as the Investment Manager for the Bond Funds at issue in the Plan and, upon information and belief, hundreds of other plans as well.  In this capacity, State Street was responsible for prudently and loyally managing the assets that were invested in the Bond Funds.

41.    State Street expressly acknowledges its status as Investment Manager in the Plan documents for the Plan, including the Plan's December 31, 2006 and June 30, 2007 Fact Sheets.

42.    Upon information and belief, State Street has similarly acknowledged its fiduciary status as Investment Manager for the Bond Funds for all other ERISA qualified funds that offer the Bond Funds as an investment option for participants' retirement savings.

### VII.     FACTS BEARING ON FIDUCIARY BREACH

**A.    THE STATE STREET BOND FUNDS AND THEIR PURPORTED INVESTMENT STRATEGY**

43.     State Street had sole investment discretion as to each of the Bond Funds at all relevant times.  Neither Plaintiffs nor any member of the Class had the discretion to direct the manner in which State Street invested any of the assets of the Bond Funds offered     to     the     Plan     or     any     other     plans     included     in     the     Class. State Street represented that the Bond Funds were safe, conservative investments that would provide stable, predictable levels of return.  The Bond Funds were purportedly designed to track, and exceed, the performance of the specified bond market indices. These Funds, sometimes referred to as "enhanced index funds," purportedly offered the security of an index fund with a slight benefit provided by moderate active management intended to provide a return better than that of the designated indices.  Indeed, State Street stressed in communications with plan sponsors, fiduciaries and participants that the Bond Funds were low risk investments.

44.     For example, the Enhanced Intermediate Bond Fund was described as appropriate for low to intermediate risk investors seeking only moderate potential fluctuations in their account balance.  State Street described the Investment Objective of the Enhanced Intermediate Bond Fund as "to match or exceed the return of the Lehman Brothers Intermediate Government/Credit Bond Index   State Street further represented that the "the Fund invests only in high quality bonds – those rated at least BBB- by Standard & Poor's or Baa3 by Moody's Investors Service."

45.     The very selection of that particular Lehman Index as the benchmark for the Fund signaled to investors the Fund's purportedly conservative investment profile,

because the Lehman Brothers Intermediate Government/Credit Bond Index which features a blend of U. S. Treasury, government-sponsored (U. S. Agency and supranational), mortgage and corporate securities limited to a maturity of no more than ten years.. The selection of this benchmark thus reinforced State Street's representation that the Bond Funds would invest in stable funds.

46.    State Street represented to plan sponsors, fiduciaries, and participants that its management of the State Street Bond Funds reflected a disciplined, risk-controlled investment process that would protect investors from risk driven by random and unpredictable events. For example, the Intermediate Bond Fund's December 31, 2006 Fact Sheet states that "this fund may be appropriate for you if you have a short to medium investment time frame or if you are looking to generate income and add stability of principal to your portfolio as you near retirement."

47.    Participants in ERISA plans throughout the country that offered the State Street Bond Funds invested in the funds as a safe and secure, conservative investment for retirement assets. For example, during the Class Period, the Andover Companies Plan invested approximately $3 million in the Bond Funds.

48.    Collectively, hundreds of millions, if not billions, of dollars were invested in the Bond Funds. All of the money invested in the funds through the hundreds of plans that offered the funds was pooled by State Street into a collective trust for each Bond Fund. As a result, State Street's imprudent management of each Bond Fund affected all of the many plans that invested in the funds in the same manner.

**B.    STATE STREET ABANDONED THE FUNDS' CONSERVATIVE INVESTMENT PROFILE TO SPECULATE IN HIGH-RISK MORTGAGE-BACKED INVESTMENTS**

49.    State Street could not have picked a worse time to violate its fiduciary duty, which it owed to the Plan and the Class that had invested in State Street's supposedly stable, conservative Bond Funds, by speculating in high risk securities.  At the latest by the first quarter of 2007, State Street – in violation of its fiduciary duties and with wanton disregard for the interests of the investors in the Bond Funds – began to heavily invest the Bond Funds in financial instruments backed by mortgage-backed securities.  These high-risk investments directly exposed the Bond Funds to the volatility of the subprime mortgage market at precisely the time when it was publicly reported that defaults of subprime mortgages were skyrocketing, and that numerous subprime lenders were facing insolvency.

50.    For example, between December 31, 2006 and June 30, 2007, the percentage of the Enhanced Intermediate Bond Fund comprised of asset-backed securities doubled from 17.18% to 35.75%.  Over that same period, State Street also quadrupled the Fund's allocation of mortgage-backed securities from 0 .73% to 2.5%.

51.    "Subprime" mortgage loans refer to loans with unconventional terms, such as discounted "teaser" interest rates, an inordinately high loan to equity ratio, or an extended period for repayment or describe loans made to borrowers with low income and/or poor credit history who do not qualify for standard ("prime") mortgage loan terms.  To create liquidity for these subprime mortgages, lenders combine them with other asset-backed securities to form a "collateralized debt obligation" or "CDO".  CDOs are then sold to investors, who are entitled to the cash flow from the monthly mortgage payments (principal and/or interest) paid by the mortgage borrowers.  This type of bundling

increases funding to the lenders by reducing risk – through the pooling of the loans – and by allocating risk to the investors that are willing to bear it.

52.    In 2005 and 2006, the Federal Reserve instituted a series of interest rate hikes and the interest rates on variable rate loans, including mortgage loans, began to rise. Subprime borrowers who were able to afford the initially low "teaser rate" loan payments no longer could meet their monthly payment obligations.  At the same time, home values began to decline sharply, leading some borrowers to walk away from loans when they could not afford the increased monthly mortgage and could not readily re-sell the property for a profit. As a result, many borrowers no longer paid their mortgages, causing defaults to increase significantly.  The widespread failure of the subprime mortgages that underlie CDOs and other mortgage-backed securities impaired the value of those securities.

53.    The imminent collapse of the subprime lending industry was widely-documented.  In December 2006, the Center for Responsible Lending issued a report predicting the worst foreclosure crisis in the modern mortgage market . *See* Ron Nixon, *Study Predicts Foreclosure For 1 In 5 Subprime Loans*, New York Times, (December 20, 2006).  Shortly thereafter, several major mortgage lenders disclosed extraordinary rates of loan defaults, triggering inquiries from SEC and FDIC, and resulting in several bankruptcy filings.  In this financial environment, State Street exposed plan participants to inordinate and unacceptable risk by investing in such securities and instruments, and caused losses that would not have occurred had State Street managed the Bond Funds according to their stated purpose.

17

54.    The subsequent collapse of the subprime lending industry – which was in full swing by March of 2007 – signaled that securities and derivative instruments backed by subprime and other high-risk asset-backed securities were highly risky and not suitable for conservative, fixed-income funds such as the Bond Funds.  Indeed, on March 13, 2007, the Mortgage Bankers Association announced that during the fourth quarter of 2006, U.S. subprime borrowers fell behind in their mortgages at the highest rate in over four years—up nearly a point from the previous quarter—and that foreclosures had jumped to an all-time high.  Still, State Street continued investing the Bond Funds' assets in subprime mortgage-backed securities and risky asset-backed securities even though State Street served as the Investment Manager for hundreds of ERISA retirement plans that invested in the funds, and had represented to Plan fiduciaries, participants and beneficiaries that the funds were stable and conservative investments.

C.    STATE STREET'S HIGH RISK GAMBLE WITH PARTICIPANTS' RETIREMENT ASSETS COMES TO LIGHT

55.    On or about August 2007, after much of the damage already was done, State Street began to reveal the massive risk to which it had exposed investors in the Bond Funds

56.    According to The Wall Street Journal, on August 14, 2007, Sean Flannery, the Chief Investment Officer for SSGA, wrote to State Street's clients that "in the midst of the recent turmoil in the fixed-income markets, many of our active bond strategies sharply underperformed."  Flannery attributed that underperformance to the fact that State Street had "focused increasingly on housing-related assets" in order to increase returns.

57.    In that letter, State Street also disclosed that it had multiplied the risk inherent in those investments by making the investments with borrowed funds. Specifically, the letter stated that, as of July 31, the Government/Credit Bond Fund was leveraged to nearly 6-to-1 – meaning that the fund borrowed to increase its portfolio to about six times the amount of money clients invested.  In addition, that August 14 letter disclosed that State Street had also invested in Treasury futures, options on futures, interest rate swaps and interest rate "swaptions."

58.    There is no question that the losses incurred by the Bond Funds result from investments in subprime mortgage-backed securities and derivatives of such securities.  According to Bloomberg News, a State Street spokeswoman confirmed that "portfolios 'with over-weights in residential mortgage-backed securities, representing various risk/return profiles, have been impacted negatively by the recent market conditions."

59.    The losses incurred as a result of State Street's misconduct are staggering. The Limited Duration Bond Fund lost about 37 percent of its value during the first three weeks of August, and by late August had fallen 42 percent for the year.  Between July 1, 2007 and September 1, 2007, the Government Credit Bond Fund declined by 12% and the Intermediate Bond Fund declined by 25%, while the indices they purported to track actually increased.  The Plan's investment in the Bond Fund lost approximately 14% of its value since January 1, 2007.

60.    Had State Street managed the Bond Funds appropriately and according to their stated objective and risk level, the losses suffered by the Plan and the Class would not have occurred.  Instead, by gambling with participants' retirement assets, State Street

squandered hundreds of millions of dollars in retirement assets. State Street and the individual State Street fund managers involved are personally liable for the losses they caused.

**D.    STATE STREET IMPRUDENTLY MANAGED THE BOND FUNDS IN VIOLATION OF ITS DUTIES UNDER ERISA**

61.    State Street's conduct with respect to the Bond Funds was grossly negligent and a clear dereliction of its duties as an ERISA investment manager. The conduct was manifestly imprudent because, among other reasons:

- The Defendants knew of and/or failed to investigate the hazards of its highly risky and speculative investments in securities and derivatives, and the highly leveraged manner in which it made these investments;

- The risk associated with the investment in mortgage-backed financial instruments and other investments described herein during the Class Period was far above and beyond the normal, acceptable risk associated with investment in fixed income securities;

- Defendants failed to fully and fairly disclose to ERISA plan participants and beneficiaries State Street's deviation from the stated objectives of the Bond Funds and the extreme risk to participants' retirement assets caused by this change;

- Defendants had a duty to avoid speculating with participants retirement assets and mismanaging the assets in the manner alleged herein; and

- Knowing that the Bond Funds were intended to be diversified funds, tracking public indices, and that to the extent that any portion of the assets of the Bond Funds could be invested in higher risk investments,

20

Defendants had a heightened responsibility to avoid placing a significant portion of the assets of the Bond Funds in such investments, so as to avoid the risk of large losses precipitated by such investment.

62.    A prudent Investment Manager acting prudently, loyally, and for the exclusive purpose of plan participants, as required by ERISA, would not have gambled with participants' retirement savings as State Street did in this case, and instead would have adhered to the stated conservative objective of the Bond Funds.

## VIII.    THE RELEVANT LAW

63.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action for breach of fiduciary duty may be brought by the Secretary of Labor, or a participant, beneficiary or fiduciary of a plan for relief under ERISA § 409, 29 U.S.C. § 1109.

64.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part,

> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

65.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to seek equitable relief from defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

21

66.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

67.    These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Donovan v. Bierwith*, 680 F.2d 263, 272 n.2 (2d Cir. 1982).  They entail, among other things:

> (a)    The duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan, including in this instance the Bond Funds;

> (b)    The duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

> (c)    The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

68.    According to DOL regulations and case law interpreting this statutory provision, in order to comply with the prudence requirement under ERISA §404(a), a fiduciary must show that: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary

knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

69.     Again, according to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

- A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), *to further the purposes of the plan*, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

- Consideration of the following factors as they relate to such portion of the portfolio:

    o   The composition of the portfolio with regard to diversification;

    o   The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

    o   The projected return of the portfolio relative to the funding objectives of the plan.

70.     As set forth herein and specifically in the Count I of the Complaint, State Street failed abysmally in this regard, and generally, in their duty to manage the assets of the Bond Funds prudently, loyally, and in the best interests of the Plan and the Class.

23

71.    Plaintiffs therefore bring this action under the authority of ERISA §
502(a)(2) for relief under ERISA § 409(a) to recover losses sustained by the Bond Funds
arising out of the breaches of fiduciary duties by the Defendants for violations under
ERISA § 404(a)(1).

## IX.    ERISA § 404(C) DEFENSE INAPPLICABLE

72.    ERISA § 404(c) is an affirmative defense that provides a limited exception
to fiduciary liability for losses that result from participants' or plans' exercise of control
over investment decisions.  For § 404(c) to apply, participants or plans must in fact
exercise "independent control" over investment decisions, and the fiduciaries must
otherwise satisfy the numerous procedural and substantive requirements of ERISA §
404(c), 29 U.S.C. § 1104(c), and the regulations promulgated under it.

73.    ERISA § 404(c) does not apply here for several reasons.  First, ERISA §
404(c) does not and cannot provide any defense to State Street's decision to implement
and maintain an imprudent investment strategy for the Bond Funds, as these were not
decisions that were made or controlled by the participants or plans.  *See* Final Reg.
Regarding Participant Directed Individual Account Plans (ERISA Section 404(c) Plans)
("Final 404(c) Reg."), 57 Fed. Reg. 46906-01, 1992 WL 277875, at *46924 n.27 (Oct.
13, 1992) (codified at 29 C.F.R. pt. 2550) (noting that "the act of limiting or designating
investment options which are intended to constitute all or part of the investment universe
of an ERISA § 404(c) plan is a fiduciary function which, whether achieved through
fiduciary designation or express plan language, is not a direct or necessary result of any
participant direction of such plan").  Rather, State Street exclusively controlled how the
assets invested in the Bond Funds were invested.

74.    Second, ERISA § 404(c) does not apply because Defendants failed to ensure effective participant or plan control by providing complete and accurate material information to participants and plans regarding the manner in which State Street managed the Bond Funds.    *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B) (the participant must be provided with "sufficient information to make informed decisions").    Whereas State Street claimed the funds were stable, conservative bond funds, in truth, State Street invested Bond Fund assets in highly risky and inappropriate securities and derivatives. As a consequence, participants and plans did not have informed control over the portion of their assets that were invested in the Bond Funds as a result of their investment directions, and the Defendants remain entirely responsible for losses that result from such investment.

75.    Because ERISA § 404(c) does not apply here, State Street's liability to the Plan, Plaintiffs, and the Class (as defined above) for losses caused by the Bond Funds' undisclosed, risky investment strategies is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period.

## X.    CLAIMS FOR RELIEF

### COUNT I

#### AGAINST STATE STREET BANK, SSGA AND JOHN DOES 1-20 FOR
#### FAILURE TO PRUDENTLY AND LOYALLY MANAGE THE PLANS AND THEIR ASSETS

76.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

77.     Under Section 3(21) of ERISA, 29 U.S.C. § 1002(21), State Street was at all relevant times an ERISA fiduciary as to the retirement plans and plan assets invested in the Bond Funds.

78.     Under Section 3(38) of ERISA, 29 U.S.C. § 1002(38), State Street was at all relevant times the Investment Manager of the Bond Funds that were made available to retirement plans and plan participants, including the Plan.

79.     As alleged above, the scope of the fiduciary duties and responsibilities of the State Street included managing the assets of the Bond Funds.

80.     The Defendants were obligated to discharge their duties with respect to the Bond Funds with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

81.     Yet, contrary to their duties and obligations under ERISA, the Defendants failed to loyally and prudently manage the assets of the Plan in the Bond Funds managed by State Street.  Specifically, State Street breached its duties to the participants, in violation of ERISA § 404(a), by, *inter alia*, (a) failing to provide complete and accurate information regarding the investments it made in the Bond Funds, and specifically, its decision to invest in highly risky and speculative securities and derivatives instead of the stable, and conservative investments as was appropriate for the Bond Funds; (b) failing to notify Plaintiffs or the Plan of State Street's change in investment strategy, (c) altering the Bond Funds' investment strategy to include investments fundamentally inconsistent with the stated purposes of the Bond Funds, (d) exposing the Bond Funds to excessive

26

levels of risk through inappropriate leverage and accumulation of investments in mortgage-related financial derivatives, (e) failing to maintain sufficient diversification in the investments held by the Bond Funds in light of their stated objectives, and (f) generally failing to invest and manage the assets of the Bond Funds in the manner of a reasonably prudent fiduciary acting under similar circumstances.

82.    Moreover, the Defendants failed to conduct an appropriate investigation of the merits of its highly risky and speculative investment management decisions even in light of the high risk of these inappropriate investments and the particular dangers that these holdings posed to the Bond Funds. Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of mismanaging the assets of the Bond Funds in the manner alleged herein. A reasonably prudent fiduciary would have managed the assets according to their stated objective as opposed to gambling with participants' retirement savings as Defendants did in this case.

83.    As a consequence of the Defendants' breaches of fiduciary duties alleged in this Count, the Bond Funds suffered massive losses. Had Defendants discharged their fiduciary duties to prudently invest the Bond Funds' assets, the losses suffered would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan and the other Class members, lost hundreds of millions of dollars of retirement savings.

84.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) & (a)(3), the Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## XI.    LOSS CAUSATION

85.    The State Street Bond Funds suffered hundreds of millions of dollars in losses because substantial assets of the State Street Bond Funds were imprudently invested or allowed to be invested by Defendants during the Class Period, in breach of Defendants' fiduciary duties.

86.    Defendants are liable for these losses because they were caused by Defendants' breaches of fiduciary duty, including but not limited to, their imprudent decision to alter the investment strategy of the Bond Funds' and invest the Bond Funds' assets in volatile asset-backed securities and risky mortgage-backed instruments, engage in highly leveraged and risky transactions with Bond Fund assets, invest Bond Funds' assets in securities that are not typical of those in the indices which State Street purportedly designed the Bond Funds to track, all of which was imprudent under the circumstances presented here.

87.    Had the Defendants properly discharged their fiduciary duties, the ERISA plans that offered the Bond Funds and for which State Street served as Investment Manager, would have avoided some or all of the losses that the plans, and, indirectly, the plan participants and beneficiaries suffered.

## XII.    REMEDY FOR BREACHES OF FIDUCIARY DUTIES

88.    The Defendants breached their fiduciary duties in that they knew, or should have known, the facts as alleged above, and therefore knew, or should have known, that the Bond Funds' assets should not have been invested in mortgage-backed instruments during the Class Period, or otherwise invested improperly as described herein.

89.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes the Secretary of Labor, or a participant, beneficiary or fiduciary of a plan to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary...who breaches any of the...duties imposed upon fiduciaries...to make good to such plan any losses to the plan...." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate...."

90.    With respect to calculation of the losses to the Bond Funds, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plan would not have made or maintained their investments in the challenged investment and, instead, prudent fiduciaries would have invested the Plan's assets prudently and appropriately, and in this instance, according to the stated objective of the Bond Funds. In this way, the remedy restores the Plan's lost value and puts the participants in the position they would have been in if the Plan had been properly administered.

91.    Plaintiffs, on behalf of the Plan and the Class, are therefore entitled to relief from the Defendants in the form of: (a) a monetary payment to the ERISA plans that offered the Bond Funds to make good to the ERISA plans the losses resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3); (c) injunctive and other appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), to the extent applicable for knowing participation by a non-fiduciary in a fiduciary breach; (d) reasonable attorney fees and expenses, as provided by

29

ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (e) taxable costs and interest on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

92.    Under ERISA, each Defendant is jointly and severally liable for the losses suffered in this case.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the Plan and the Class;

B.    A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.    An Order compelling the Defendants to make good to the ERISA plans that offered the Bond Funds for which State Street served as the Investment Manager all losses to the ERISA plans resulting from Defendants' breaches of their fiduciary duties, including losses to the plans resulting from imprudent investment of the Bond Fund's assets, and to restore to the plans all profits the Defendants made through use of the plans' assets, and to restore to the plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the plans as the result of breaches of fiduciary duty;

E.    An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Bond Funds for ERISA plans;

F.    Actual damages in the amount of any losses to the ERISA plans included in the Class to be allocated among the participants' individual accounts within the plans in proportion to the accounts' losses as required by ERISA;

G.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.    An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law;

I.    An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants; and

J.    Granting such other and further relief as the Court may deem just and proper.

Dated: December 7, 2007                    Respectfully submitted,


*Derek Loeser / JH*                        *Jonathan Harris*
**KELLER ROHRBACK LLP**                    **BERNSTEIN LITOWITZ BERGER**
Lynn L. Sarko                              **& GROSSMANN LLP**
Derek W. Loeser                            Steven Singer (SS-5212)
Karin B. Swope                             Jonathan Harris (JH-3047)
Tyler L. Farmer                            1285 Avenue of the Americas
1201 Third Avenue, Suite 3200              New York, New York 10019
Seattle, Washington 98101                  Telephone: (212) 554-1400
Telephone: (206) 623-1900                  Facsimile: (212) 554-1444
Facsimile: (206) 623-3384

*Counsel to Merrimack Mutual Fire Insurance Co. and Alan Kober and Proposed Lead Counsel to the Class*

31