UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X
                               :

IN RE STATE STREET BANK AND TRUST  :
CO. ERISA LITIGATION                     :

This document relates to:              :        07 Civ. 8488 (RJH)
                               :
07 Civ. 8488                    :
07 Civ. 9319                    :
07 Civ. 9687                    :
                               :
-----------------------------------------------------------X
                               :

NASHUA CORPORATION PENSION PLAN  :
COMMITTEE et al.,                   :
                               :
           Plaintiffs,      :
                               :
v.                              :        08 Civ. 0265 (unassigned)
                               :
STATE STREET BANK AND TRUST      :
COMPANY, STATE STREET GLOBAL    :
ADVISORS, INC., AND JOHN DOES 1-20, :
                               :
           Defendants.    :
                               :
-----------------------------------------------------------X

## DECLARATION OF MARK DUGGAN

      MARK DUGGAN declares as follows:

      1.      I am Senior Managing Director and Deputy General Counsel of State Street

Global Advisors ("SSgA"). I make this declaration in support of the motion by State Street Bank

and Trust Company ("SSBT") and State Street Global Advisors, Inc. (together, "State Street"), to

transfer venue to the District of Massachusetts pursuant to 28 U.S.C. § 1404(a) in the above-

captioned cases. This declaration is based upon my personal knowledge and upon review of SSgA's records.[1]

2.       SSBT is a Massachusetts trust company and a wholly-owned subsidiary of State Street Corporation. SSBT provides custodial and other financial services to institutional investors. While SSBT does have an office in New York, its principal place of business is in Boston.[2]

3.       SSgA is a division of SSBT with its principal place of business in Boston, Massachusetts. SSgA's primary business is to provide investment management services to institutional investors. SSgA does not have any offices in New York. Its employees, bank accounts and property are principally located in the Commonwealth of Massachusetts.

4.       It is my understanding that as of October 2007, approximately 1,137 SSgA employees – of a total 1,829 employees – worked in the United States. Of these 1,137 domestic employees, approximately 1,102, or approximately 97%, work in Massachusetts, while only 3 employees, or less than 1%, work in New York.

5.       These actions appear to arise out of SSgA's investment management of certain actively managed fixed income funds on behalf of Prudential Retirement Insurance and Annuity Company ("PRIAC"), the Unisystems, Inc. Employees Profit Sharing Plan ("the Unisystems Plan"), the Andover Companies Employees Savings and Profit Sharing Plan ("the Andover

---

[1] All four plaintiffs have named State Street Global Advisors, Inc., as a defendant. State Street Global Advisors, Inc., is a wholly-owned subsidiary of State Street Corporation that operates as a holding company for several underlying entities, but does not perform any of the investment management services that are, to my understanding, at issue in these cases. State Street Global Advisors ("SSgA") is a division of SSBT, but is not a separate legal entity and is not the same as State Street Global Advisors, Inc. SSgA performs the investment management services that I understand are at issue in these cases.

[2] State Street Corporation is also incorporated in, and has its principal place of business in, Massachusetts.

Plan"), and two retirement plans offered by the Nashua Corporation (together, "the Nashua Plan"), and other ERISA plans.

6.    All of the actively managed fixed income funds that I understand to be at issue in these cases were formed in Massachusetts and are managed by portfolio managers located there.

7.    It is my understanding that the Andover Plan was established for the benefit of employees of Merrimack Mutual Fire Insurance Company ("Merrimack"), a subsidiary of The Andover Companies. Merrimack is incorporated in Massachusetts and has its principal place of business in Massachusetts. To my knowledge, neither The Andover Companies nor Merrimack maintain any offices outside of Massachusetts.

8.    The relationship between the Andover Plan and SSgA at issue is governed by an Investment Manager Agreement ("Andover IMA"), originally effective April 1, 2001, and the letter restatement dated March 19, 2007. A copy of the Andover IMA is attached hereto as Exhibit A, and the letter restatement is attached as Exhibit B.

9.    To my knowledge, the Andover IMA was negotiated and signed in Massachusetts.

10.   Paragraph 7(d) of the Andover IMA and the restatement provides that the agreements are to be "administered and construed, to the extent permitted by ERISA, according to the laws of the Commonwealth of Massachusetts."

11.   As I understand it, the only actively managed fixed income fund in which the Andover Plan has alleged it was invested in connection with this litigation was the Enhanced Intermediate Bond Fund.

12.   All of SSgA's investment decisions on behalf of the Andover Plan's investment in the Enhanced Intermediate Bond Fund were made by SSgA portfolio managers, all of whom are

located in Massachusetts. I have been informed that nobody from SSgA has ever visited New York in connection with the Andover Plan's investment in the Enhanced Intermediate Bond Fund.

13.    It is my understanding that the Nashua Plan was established for the benefit of employees of the Nashua Corporation ("Nashua"), which is headquartered in Nashua, New Hampshire. According to its website, Nashua maintains offices in Massachusetts, but not in New York.

14.    The relationship between the Nashua Plan and SSgA at issue is governed by an Investment Management Agreement ("Nashua IMA"), originally effective May 13, 1997, and subsequently amended in part. A copy of the Nashua IMA is attached hereto as Exhibit C.

15.    To my knowledge, the Nashua IMA was negotiated and signed in Massachusetts and New Hampshire.

16.    Paragraph 7(d) of the Nashua IMA provides that the agreement is to be "administered and construed, to the extent permitted by ERISA, according to the laws of the Commonwealth of Massachusetts." None of the subsequent amendments to the Nashua IMA have affected this provision.

17.    As I understand it, the only actively managed fixed income fund in which the Nashua Plan has alleged it was invested in connection with this litigation was the Daily Bond Market Fund.

18.    All of SSgA's investment decisions on behalf of the Nashua Plan's investment in the Daily Bond Market Fund were made by SSgA portfolio managers, all of whom are located in Massachusetts. I have been informed that nobody from SSgA has ever visited New York in connection with the Nashua Plan's investment in the Daily Bond Market Fund.

19.     The relationship between Unisystems and SSgA at issue is governed by an Agreement of Trust ("Unisystems Agreement"), originally effective January 3, 2005, and amended in May 2007. Copies of the Agreement of Trust and the amendment are attached hereto as Exhibits D and E.[3]

20.     Paragraph 9 of the Unisystems Agreement provides that the "trust hereby created shall be in all respects governed by the laws of Massachusetts."

21.     As I understand it, the only actively managed fixed income fund in which the Unisystems Plan has alleged it was invested in connection with this litigation was the Intermediate Bond Fund.

22.     All of SSgA's investment decisions on behalf of the Unisystems Plan's investment in the Intermediate Bond Fund were made by SSgA portfolio managers, all of whom are located in Massachusetts.

23.     It is my understanding that PRIAC offers an array of financial products and services, including pension and retirement-related services and administration. PRIAC is incorporated in Connecticut and has its principal place of business in Hartford, Connecticut.

24.     The relationship between PRIAC and SSgA at issue is alleged to be governed by the Second Amended and Restated Investment Management Agreement ("PRIAC IMA"), which was originally entered into by State Street and Connecticut General Life Insurance Company ("CIGNA") in June 2003, and subsequently amended in part. As I understand it, CIGNA later

---

[3] To my knowledge, although Unisystems executed the Agreement of Trust on January 3, 2005, State Street did not execute the Agreement until June 29, 2007 due to an administrative oversight. The parties have nevertheless treated the Agreement's effective date as January 3, 2005. For example, the May 29, 2007 letter Amendment states that the parties "previously entered into an Agreement of Trust dated January 3, 2004." I understand that this date is a typographical error and was intended to state that the Agreement was dated January 3, 2005.

became part of PRIAC, and the PRIAC IMA remained in effect. A copy of the PRIAC IMA is attached hereto as Exhibit F.

25.     To my knowledge, the PRIAC IMA was negotiated and signed in Massachusetts and Connecticut by the respective parties.

26.     Paragraph 7(d) of the PRIAC IMA provides that the Agreement is to be "administered and construed, to the extent permitted by ERISA, according to the laws of the Commonwealth of Massachusetts." None of the subsequent amendments to the PRIAC IMA have affected this provision.

27.     As I understand it, the PRIAC litigation concerns investments in two actively managed fixed income funds offered by SSgA – the Intermediate Bond Fund and the Government Credit Bond Fund.

28.     All of SSgA's investment decisions on behalf of PRIAC's investments in the Intermediate Bond Fund and Government Credit Bond Fund were made by SSgA portfolio managers, all of whom are located in Massachusetts. Similarly, all of SSgA's representations in connection with the PRIAC investments at issue originated in Boston, Massachusetts. I have been informed that nobody from SSgA has ever visited New York in connection with investments by PRIAC in the Intermediate or Government Credit Bond Funds.

29.     At this stage of the litigation, State Street is able to identify several potential, significant non-party witnesses – all of whom reside in Massachusetts and would not, as I understand it, be subject to compulsory process in New York. Those witnesses are:

> a. Portfolio managers for the actively managed fixed income funds at issue in the complaints during the relevant period. These former portfolio managers would testify about the challenged investment decisions regarding their respective funds,

including the investment objectives of the funds; the strategies employed to achieve those objectives and the prudence of such strategies (including so-called leveraged investments and investments in asset-backed securities); and how risk associated with investment decisions was calculated. These individuals include:

   i.  Robert Pickett, who I understand was portfolio manager of the Intermediate Bond Fund during the relevant period, in which the Unisystems Plan and PRIAC clients invested, and portfolio manager of the Enhanced Intermediate Bond Fund, in which the Andover Plan invested, who would testify about investment decisions and analysis in connection with those funds;

   ii. Susan Reigel, who I understand was portfolio manager of the Daily Bond Market Fund during the relevant period, in which the Nashua Plan invested, and the Government Credit Bond Fund, in which PRIAC clients invested, who would testify about investment decisions and analysis in connection with those funds; and

   iii. Frank Gianatasio, who I understand was head of Asset Backed Securities and the secured credit group, as well as portfolio manager of the SSgA Yield Plus Fund, who would testify about investment decisions and analysis in connection with various actively managed fixed income funds.

b. Paul Greff, who was Director of Global Fixed Income during the relevant period, and who would testify about the role and organization of the Global Fixed Income group, its practice, procedures, strategies and oversight;

c.  Michael Wands, who was Director of North American Fixed Income during the relevant period, and who would testify about the role and organization of the North American Fixed Income Group, its practice, procedures, strategies and oversight;

d.  Erik Saarinen, former relationship manager for the Andover Plan and PRIAC, who would testify about SSgA's relationships with both plaintiffs;

e.  Kimberly Gluck, former relationship manager and portfolio manager for the Unisystems Plan, who would testify about SSgA's relationship with the Unisystems Plan, as well as the strategies employed on its behalf;

f.  Greg Mulready, former relationship manager and sales contact for PRIAC, who would testify about SSgA's relationship with PRIAC and the strategies employed on its behalf, as well as about the products offered by SSgA to PRIAC;

g.  Joe Dougherty, a former member of SSgA's reporting group who provided reporting for the PRIAC account, and who would testify about such reports as well as SSgA's relationship with PRIAC;

h.  Keith Fuller, Ray Dame, and Doug Lankow, representatives of CitiStreet LLC ("CitiStreet"), who would testify about the relationship between CitiStreet, State Street, and the Andover Plan, the Plan's investment objectives, the process through which the Plan made investment decisions, and CitiStreet's role; and

i.  Jay Roney, representative of New England Pension Consultants, LLC ("NEPC"), who would testify about the relationship between NEPC, State Street, and the Nashua Plan, the Plan's investment objectives, the process through which the Plan made investment decisions, and NEPC's advisory role.

30.    It is my belief that all of these individuals would find it more convenient to testify in Massachusetts, where they reside and where they are also subject to compulsory process.

31.    I believe that it would be disruptive to the business of the current employers of Erik Saarinen, Kimberly Gluck, Greg Mulready, and Joe Dougherty, as well as to CitiStreet and NEPC, for their employees to have to come to New York because of this litigation.    My understanding is that CitiStreet is a Delaware limited liability corporation with its principal place of business in Quincy, Massachusetts, while NEPC is headquartered in Cambridge, Massachusetts.

32.    At trial, State Street would also rely on testimony from the following current SSgA employees, all of whom reside and work in Massachusetts:

    a.    Members of SSgA's sales, marketing, relationship management and consultant relations teams, who would testify about the organization, function, and oversight of the client relationship groups responsible for plaintiffs' accounts, SSgA's relationships with plaintiffs, and disclosures and statements made concerning the actively managed fixed income funds at issue in these litigations.    These client relationship team members include:

        i.    Marc Brown, Chief Marketing Officer, who would testify about the role played by the client relationship group, and oversight of the client relationship teams;

        ii.    Jerry Kelly, Head of Sales, who would testify about negotiating the Unisystems Agreement;

        iii.    Larry Carlson, co-Head of U.S. Relationship Management, who would testify about negotiating and signing the Andover IMA;

9

iv. Staci Reardon, co-Head of U.S. Relationship Management, who would testify about the objectives, organization, practices and procedures of the U.S. relationship management teams, as well as about oversight of those teams;

v. Melissa Albonesi, relationship manager for the Unisystems Plan, who would testify about the relationship between SSgA and Unisystems, the stated objectives of the Unisystems Plan, representations made by SSgA, and any concerns on the part of Unisystems or the Unisystems Plan's representatives;

vi. Dan Farley and David Ireland, both Vice Presidents of Asset Allocation, who would testify about the investment strategies and investment classes originally discussed with representatives of the Unisystems Plan;

vii. Mark Bergin, relationship manager for the Nashua Plan, who would testify about the relationship between SSgA and Nashua, the stated objectives of the Nashua Plan, representations made by SSgA, and any concerns on the part of the Nashua Plan's representatives;

viii. William Porter, the former consultant liaison for the Nashua Plan, who would testify about the relationship between SSgA, NEPC, and Nashua, the stated objectives of the Nashua Plan, representations made by SSgA, NEPC's advisory role, and any concerns on the part of the Nashua Plan's representatives;

ix. Mark Flinn, the relationship manager for PRIAC, who would testify about the relationship between SSgA and PRIAC, the stated objectives of

PRIAC's investments on behalf of its plan clients, representations made by SSgA, and any concerns on the part of PRIAC;

   x. Sonya Hughes, the former relationship manager for PRIAC, who would testify about the relationship between SSgA and PRIAC, the stated objectives of PRIAC's investments on behalf of its plan clients, representations made by SSgA, and any concerns on the part of PRIAC; and

   xi. Brian Burke, a member of SSgA's Client Reporting and Operational Support Group, who provided reporting services for the PRIAC account, and who would testify about communications with PRIAC regarding the fixed income funds.

b. Product engineering team members for SSgA's actively managed fixed income funds. Product engineers at State Street interact with both portfolio managers, in order to develop an in-depth understanding of the funds, and clients, with whom they discuss portfolio strategies. They would testify about the analysis, interpretation, and basis for disclosures relating to the composition and performance of the active fixed income funds at issue in these cases. Product engineering team members likely to testify include:

   i. Adele Kohler, Senior Managing Director and Head of Product Engineering, who would testify about the role played by the product engineers, their practices and procedures, and oversight of the product engineers; and

      ii.   James Hopkins, head of the U.S. Fixed Income Product Engineering Group, which covers, among others, the Intermediate Bond Fund, the Enhanced Intermediate Bond Fund, the Daily Bond Market Fund, and the Government Credit Bond Fund, who would testify about analysis and disclosures in connection with those funds, as well as their performance.

33.    It would be disruptive to the business of SSgA if the foregoing employees were required to travel to New York because of this litigation. This burden would be significantly lessened if these cases were transferred to the District of Massachusetts.

34.    I believe that, if anything, transfer to Massachusetts would be more convenient for the Andover Plan, whose fiduciaries and participants work in Massachusetts.

35.    Similarly, I believe that, if anything, transfer to Massachusetts would be more convenient for the Nashua Plan, because Nashua is headquartered in Nashua, New Hampshire. To my knowledge, the distance between Nashua, New Hampshire and Boston, Massachusetts is approximately forty miles, while the distance between Nashua, New Hampshire and New York, New York is over 200 miles.

36.    I believe that litigation in Massachusetts would be no less convenient for PRIAC, whose employees work in Hartford, Connecticut. To my knowledge, the distance between Hartford, Connecticut and Boston, Massachusetts is approximately the same as, and slightly shorter than, the distance between Hartford and New York, New York.

37.    I believe that both State Street and plaintiffs would rely principally upon the testimony of the aforementioned SSgA employees, former employees, CitiStreet, and NEPC employees at trial because the allegations of the four complaints primarily concern actions taken by SSgA.

38.    Other plans invested in the active fixed income funds at issue in these cases are located in approximately 31 states (including the District of Columbia), and other international locations. I estimate that approximately 86 percent of these other plans are located outside of New York.

39.    It is my belief that the relevant records in these cases will be voluminous because of the complex financial decisions and documentation underlying the claims alleged by plaintiffs, the length of the proposed class period, the great number of SSgA employees involved in decision-making, the number of funds allegedly affected, the high volume of communications between SSgA and its clients, and the number of prospective plaintiffs. It is my understanding that the relevant records in these cases are, for the most part, in State Street's possession. All of SSgA's relevant files are located in Massachusetts. Neither SSgA nor SSBT maintains any relevant documents in New York.

40.    The relevant events underlying the complaints that took place in Massachusetts include: the formation of the actively managed fixed income funds at issue in these cases and the development of their investment strategies; decision-making concerning fund composition and risk management; trading involved with the management of each fixed income fund; analysis of the performance of the funds and comparison of their performance with the stated objectives; and the development of all promotional materials and client communications.

41.    It would be a burden for State Street to litigate this matter in New York. The vast majority of SSgA's employees and documents are in Massachusetts. The time and expense of litigating this matter in New York would be a drain on the operations of SSgA.

42.    It is my understanding that a suit against State Street also arising out of SSgA's management of an actively managed fixed income fund has been filed by Memorial Hermann

Healthcare System in Texas.  As I understand it, that lawsuit is in its earliest stages, and no discovery has occurred.

43.    It is my belief that it would be less burdensome for State Street and more efficient for all of the parties as well as the judicial system to litigate all five suits in a single forum.  I believe that resolution of all five cases will require similar discovery, including testimony from multiple State Street witnesses located in Massachusetts and review of documents located there. State Street has moved to transfer the lawsuit brought by Memorial Hermann from the Southern District of Texas to the District of Massachusetts.

44.    I declare under penalty of perjury that the foregoing is true and correct.


Executed on February 4, 2008

                                                             Mark Duggan